12 CIV 8676

# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

**Plaintiff,**

v.

THOMAS C. CONRADT and
DAVID J. WEISHAUS,

**Defendants.**

Civil Action No.:

ECF CASE



## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY OF THE ACTION

1.      This matter involves unlawful insider trading and tipping ahead of International Business Machines Corporation's ("IBM") 2009 acquisition of SPSS Inc. ("SPSS") by a group of securities industry professionals, including Defendants Thomas C. Conradt ("Conradt") and David J. Weishaus ("Weishaus"), registered representatives at a Connecticut-based registered broker-dealer (the "Broker").

2.      In late May 2009, Conradt's roommate, an Australian Equities Analyst at an international, registered broker-dealer (the "Source"), learned nonpublic, material information regarding the pending SPSS acquisition from his close friend (the "Associate"), an associate at a New York law firm (the "Law Firm") who worked on the SPSS acquisition. The Source misappropriated the information from the Associate and purchased SPSS securities on the basis

securities. Conradt, in turn, tipped Defendant Weishaus. The downstream tipping continued to, at least, three other registered representatives of the Broker (referenced herein as "RR1," "RR2," and "RR3"), each of whom worked with Conradt at the Broker's New York City office. Ultimately, the trades placed by Conradt, Weishaus, and the three registered representatives, resulted in ill-gotten gains exceeding$1 million.

3.    By knowingly or recklessly engaging in the conduct described in this Complaint, each of the Defendants violated and, unless restrained and enjoined by the Court, will continue to violate Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

4.    The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§78u(d) and 78u-1], to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties and such other and further relief as the Court may deem just and appropriate.

5.    This Court has jurisdiction over this action pursuant to Sections 21(d) and (e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1 and 78aa].

6.    Venue in this District is proper because the Defendants are found, inhabit, and/or transact business in the Southern District of New York and/or because one or more acts or transactions constituting the violation occurred in the Southern District of New York.

7.    In connection with the conduct alleged in this Complaint, Conradt and Weishaus made use of a means or instrumentality of interstate commerce, or of the mails, and/or of a facility of any national securities exchange.

## DEFENDANTS

8.     **Thomas C. Conradt**, age 34, resides in Denver, Colorado.  Conradt is a lawyer.

He was admitted to the Maryland bar in March 2011 and passed the Colorado bar examination

administered in February 2012.  From September 2, 2008 until October 13, 2009, Conradt was

employed as a registered representative with the Broker in its New York City office, at times

working with RR1, RR2, and RR3.  At all relevant times, Conradt was the Source's roommate

and friends with Defendant Weishaus, RR1, RR2, and RR3.

9.     **David J. Weishaus**, age 32, lives in Baltimore, Maryland.  Weishaus was

employed as a registered representative with the Broker from October 8, 2007 until November

10, 2009.  He worked in the Broker's New York City office from January 2008 through

September 2008, and its North Palm Beach, Florida office from October 2008 through

November 10, 2009.  Weishaus attended the same law school as Conradt, graduating a year later;

and attended high school with RR1, graduating in the same class.  At all relevant times,

Weishaus was friends with Defendant Conradt, RR1, RR2, and RR3.

## RELATED PERSONS AND ENTITIES

10.     Up until its acquisition by IBM in October 2009, **SPSS Inc.**, headquartered in

Chicago, Illinois, was a provider of predictive analytics software that performed such functions

as statistical analysis, data mining, performance measurement, and fraud detection.  At all

relevant times, its shares were publicly traded on the NASDAQ under the symbol "SPSS."

11.     The **Broker** is a Westport, Connecticut-based broker-dealer and investment

adviser registered with the Commission.  At times relevant to this Complaint, the Broker

employed Defendants Weishaus and Conradt, as well as RR1, RR2, and RR3.

12.     The **Law Firm** is a law firm with an office in New York City, New York.

13.     The **Source** is an Australian citizen.  From August 2008 through mid-September 2009, the Source worked in New York City as a Research Analyst with a broker-dealer.  The Source then transferred to a related broker-dealer in Stamford, Connecticut, where he continued to work as a Research Analyst.  As a Research Analyst, the Source also was a registered representative associated with the related broker-dealer.  The Source returned to Australia in November 2010 and resigned from the related broker-dealer on November 15, 2010.  At all relevant times, the Source was close friends with the Associate and shared an apartment with Defendant Conradt.

14.     At all times relevant to this Complaint, the **Associate,** a citizen of New Zealand, was a resident of New York and an associate at the Law Firm.  Beginning in December 2008, the Associate worked in the Law Firm's Mergers & Acquisitions Practice Group and, in late May 2009, the Associate was assigned to work on IBM's acquisition of SPSS.

15.     From August 29, 2008 until November 10, 2009, **RR1** was a registered representative associated with the Broker at its New York City office, working at relevant times with Defendant Conradt, RR2, and RR3.  RR1 attended the same high school as Defendant Weishaus, graduating in the same class.

16.     From November 1, 2007 until November 10, 2009, **RR2** was a registered representative associated with the Broker at its New York City office, working at relevant times with Defendant Conradt, RR1, and RR3.  RR2 previously worked with RR3 at a financial advisory firm.

17.     From January 26, 2009 until November 10, 2009, **RR3** was a registered representative associated with the Broker at its New York City office, working at relevant times

with Defendant Conradt, RR1, and RR2.  RR3 previously worked with RR2 at a financial advisory firm.

**FACTS**

**A.**     **IBM's Acquisition of SPSS and the Involvement of the Law Firm and the Associate.**

18.     On January 23, 2009, IBM retained the Law Firm in connection with its possible acquisition of SPSS.  In early April 2009, IBM informed SPSS that IBM had an interest in making an offer to purchase SPSS, culminating in an April 15, 2009 letter from IBM to SPSS setting forth a non-binding offer to purchase SPSS.

19.     On May 26, 2009, SPSS and IBM entered into a supplemental agreement to an existing confidentiality agreement in advance of IBM commencing due diligence.  On or about that same day, the Law Firm assigned the Associate to work on the pending acquisition.  Upon being assigned to work on this engagement, the Associate learned material, nonpublic information about the transaction, including the anticipated (per share) purchase price and the identity of the participants in the transaction.  The Associate had a duty to keep all of this nonpublic, material information confidential.

20.     On June 6, 2009, the Law Firm sent SPSS's counsel an initial draft of a merger agreement.

21.     The transaction progressed, and during the late evening on July 27, 2009, SPSS and IBM executed the merger agreement.  At 7:31 a.m. on July 28, 2009, the parties issued a joint press release announcing to the public the proposed acquisition, in which IBM would acquire SPSS in an all cash transaction for approximately $1.2 billion or $50 per share (the "Announcement").  The acquisition was completed on October 2, 2009.

5

22.     On July 27, 2009, the last trading day prior to the Announcement, the closing

price of SPSS stock was $35.09.  On July 28, 2009, the day of the Announcement, SPSS's stock

closed at $49.45 per share on heavy volume, an increase of 40.9% from the previous day's

closing price.

**B.     The Source and the Associate Shared a Relationship of Trust and Confidence.**

23.     At all relevant times, the Associate and the Source shared a relationship of trust

and confidence.  They had a history, pattern, and practice of sharing confidences.

24.     The Associate and the Source met in October 2008 through mutual friends.  As

two young professionals living in a foreign country far from home, they quickly became very

close friends.  They stayed in close contact through frequent communications and they saw each

other regularly.  The Associate considered the Source to be his closest friend in New York.

25.     The Associate and the Source frequently shared both personal and professional

confidences with one another and had a history of maintaining and not betraying those

confidences.  They regularly exchanged confidential details about their personal and professional

lives, relying on each other for support and advice.  Based on their history, pattern, and practice

of sharing confidences, each knew or reasonably should have known that the other expected such

information to be maintained in confidence.

26.     In the context of this relationship, the Source and the Associate discussed

confidential information related to their respective jobs.  For example, the Source shared with the

Associate nonpublic information that the Source learned as a Research Analyst.  On at least one

occasion, the Source permitted the Associate to view the Source's work e-mail so that the

Associate could see what type of work the Source did.  Moreover, the Associate shared with the

Source nonpublic information that the Associate learned as an associate at the Law Firm.  The

6

Associate shared such confidential information with the Source because he believed that the Source would maintain its secrecy.

27.     Over the course of their friendship, the Associate never revealed, or traded on, any confidential information that the Source shared with him.  Similarly, the Source, a securities industry professional, knew or reasonably should have known that such information disclosed to him by the Associate was nonpublic and that he was expected to maintain its confidentiality. Among other things, in or about 2009, the Source certified to his employer that he had reviewed and was familiar with the employer's policies and procedures regarding Material Nonpublic Information, which prohibit trading in a security when aware of material nonpublic information.

**C.     In the Context of their Relationship of Trust and Confidence, the Associate Disclosed to the Source Material, Nonpublic Information about the SPSS Acquisition.**

28.     On May 26, 2009, at the time that the Law Firm assigned the Associate to the SPSS acquisition engagement, the Associate had been employed at the Law Firm for only eight months and had worked in the Mergers & Acquisitions Practice Group for only four months.  He had little prior experience in that area of practice.  The Associate understood that this assignment had significant implications to his career -- among other things, the client was one of the Law Firm's largest clients and the work was very demanding.

29.     Against this backdrop, when the Associate met the Source for lunch on the subsequent weekend, the Associate's new assignment was a topic of discussion between the two men.  The Associate sought moral support, reassurance, and advice from his friend, the Source. During the course of this lunch, in connection with the discussion of the importance and magnitude of the assignment, the Associate disclosed to the Source material, nonpublic

information about the proposed transaction, including the anticipated transaction price and the identities of the acquiring and target companies.

30.     Based on, among other things, their history, pattern, and practice of sharing and maintaining confidences, the Source's sophistication as a professional in the securities industry, and the Source's knowledge of the Associate's position at the Law Firm, the Associate expected the Source to maintain this information in confidence and to refrain from trading on this information or disclosing it to others.  The Source knew or reasonably should have known that the Associate expected him to maintain the confidentiality of this information and to refrain from disclosing or trading on it.

31.     In the months that followed, the Associate and the Source continued to spend time together, as the Associate's schedule permitted.  In this regard, the Source was able to observe the Associate's work schedule, including, for example, the Associate's receipt of work-related calls late into the night, especially as the Announcement grew near.

32.     The material, nonpublic information about IBM's acquisition of SPSS disclosed by the Associate to the Source is referred to herein as the "Inside Information."

**D.     The Source Misappropriated the Inside Information and Placed Illegal Trades in SPSS.**

33.     In breach of a duty of trust and confidence that he owed to the Associate, the Source misappropriated the Inside Information and placed trades on the basis of the Inside Information.

34.     Beginning on June 1, 2009, the first business day after the Associate disclosed the Inside Information to the Source, the Source attempted to purchase SPSS common stock.  His first three orders, which were limit orders placed on June 1, June 2, and on the morning of June

8

3, respectively, were canceled because he did not have sufficient funds in the account to make the purchases.

35.     On the afternoon of June 3, 2009, the Source purchased 1,500 shares of SPSS common stock at $34.20.  On June 4, 2009, before the settlement of this trade, the Source wired $50,000 from his checking account into his brokerage account to pay for the shares.

36.     Subsequently, on July 22, 2009, the Source purchased 29 September 35 SPSS call options at $2.10 each.

37.     As used here, a call option is a right to buy 100 shares of a particular stock at a predetermined price before a preset deadline, in exchange for a premium.  For buyers who think a stock will go up, call options permit a profit from a smaller investment than it would take to buy a stock.

38.     On or about July 23, 2009, at the Source's request, the Source met with the Associate at the Associate's apartment.  During that visit the Source, for the first time, told the Associate that he had used the Inside Information to trade SPSS securities.  The Source also told the Associate that he was concerned about being caught by authorities for trading on the Inside Information.  The Associate expressed outrage and demanded that the Source sell all of his SPSS securities immediately.

39.     On Friday, July 24, 2009, the Source sold the 29 September 35 SPSS call options in his brokerage account.  On Monday, July 27, 2009, the Source sold 1,000 of his 1,500 shares of SPSS common stock.

40.     At the time of the Announcement on July 28, 2009, the Source held 500 shares of SPSS common stock in his brokerage account.  He redeemed them in the cash merger occurring on October 5, 2009, at the transaction price.  His trading resulted in profits exceeding $7,600.

E.      **The Source Tipped Conradt, Conradt Tipped Weishaus, and Both Conradt and Weishaus Traded in SPSS Securities.**

41.     In addition to placing his own trades in SPSS, the Source tipped the Inside Information to his friend and roommate, Defendant Conradt, a registered representative at the Broker.  Conradt then tipped his friend -- Defendant Weishaus -- and both Weishaus and Conradt traded in SPSS securities on the basis of the Inside Information.

42.     On November 14, 2007, Defendant Weishaus signed an "Insider Trading Certification" for his employer, the Broker, indicating that he understood that it was "unlawful, under federal and state securities laws, for any person to trade and/or recommend trading in securities on the basis of material and nonpublic, or inside information " and that the Broker's policy required "stringent avoidance of the misuse of inside information."

43.     On August 19, 2008, Defendant Conradt signed an "Insider Trading Certification" for his employer, the Broker, indicating that he understood that it was "unlawful, under federal and state securities laws, for any person to trade and/or recommend trading in securities on the basis of material and nonpublic, or inside information" and that the Broker's policy required "stringent avoidance of the misuse of inside information."

44.     At all relevant times through the time of the Announcement, Conradt and the Source were roommates.

45.     On the morning of June 24, 2009, after a June 23, 2009 late night telephone call with Conradt, Weishaus purchased 250 shares of SPSS common stock.  The next day, on June 25, 2009, Weishaus purchased 50 September 40 SPSS call options, and between June 25 and June 29, 2009, he purchased a total of 50 July 35 SPSS call options.

46.     Around this same time, Conradt also began trading in SPSS securities, purchasing 30 shares of SPSS common stock on June 26, 2009.

47.     Brokerage records dating back to April 2007 reflect that neither Conradt nor Weishaus had traded in SPSS securities in their respective brokerage accounts prior to their June trades.  Over the next month, Conradt transferred an additional $2,500 into his account and invested all of his available cash in that account, as well as over $2,000 borrowed from the brokerage firm that held his account, in SPSS securities.  Weishaus similarly focused on SPSS securities.  By the end of July, SPSS securities represented over 99% of the value of his equity holdings in his brokerage account and over 90% of his investment portfolio, and he held significantly more option contracts in SPSS than he had previously held in that account with respect to any one security.

48.     Over the month of July, Conradt and Weishaus monitored SPSS stock and discussed the fact that they traded on the basis of the Inside Information.  For instance, Weishaus sent the following instant message to Conradt on July 1, 2009:

> **Weishaus:**     somebody is buying spss
> 8000 shares traded
> hit 34

49.     In a subsequent instant message exchange, Conradt and Weishaus discussed the potential consequences of their trading on material, nonpublic information:

> **Weishaus:**     we should get [RR3] to buy a f***load
> **Conradt:**      jesus don't tell anyone else
> **Weishaus:**     like, [RR3] buy 100000 shares
> **Conradt**       we gotta keep this in the family
> **Weishaus:**     dude, no way
> i don't want to go to jail
> f*** that
> **Conradt:**      jesus christ
> **Weishaus:**     martha stewart spent 5 months in the slammer
> **Conradt:**      does [a friend] know?
> **Weishaus:**     and they tried to f*** the mavericks owner

50.     In an instant message exchange on July 10, 2009, Conradt confirmed the Source

as the source of the material, nonpublic inside information on SPSS:

| | |
|---|---|
| **Weishaus:** | we need some turn around on spss |
| **Conradt:** | yeah i called [the Source], gonna get more details tonight |
| | he was at work, couldn't talk |

51.     On July 22, 2009, about an hour and one-half after multiple communications

between Weishaus and Conradt, Weishaus purchased another 100 September 40 SPSS call

options.

52.     Conradt, too, sought to increase his position in SPSS securities about this time.  In

a July 23, 2009 instant message exchange, after Weishaus informed Conradt that ".85 is the

asking price on the sept. 40s," Conradt responded:

| | |
|---|---|
| **Conradt:** | f*** it i'm sending you another grand |
| | i want in on these options |
| | i am amazed [brokerage firm] is letting me buy on margin |
| | |
| **Weishaus:** | dude, f*** that |
| | Send it ot [sic] [brokerage firm] |
| | Youre [sic] gonna stick me with the taxes |

53.     During this same July 23, 2009 instant message exchange, Conradt acknowledged

being the source of the Inside Information to Weishaus and others, Weishaus disclosed some

further tipping, and the two revealed their expectation of the imminence of the Announcement:

| | |
|---|---|
| **Conradt:** | i got no options |
| | wtf, I'm setting this deal up for everyone |
| **Weishaus:** | haha |
| **Conradt:** | makin everyone rich |
| **Weishaus:** | [a second friend] is gonna put in 50k |
| | sept options |
| **Conradt:** | holy f*** |
| **Weishaus:** | i tlaked [sic] to him last night |
| **Conradt:** | god [the Source] told me not to tell anyone |
| **Weishaus:** | ahhaha |
| | so awesome |
| **Conradt:** | big mistake |

| | |
|---|---|
| Weishaus: | eh, we'll get rich |
| Conradt: | in any case |
| | i'm just glad to contribute actually |
| | you guys have done a lot for me, esp you and [the second friend] |
| | i didn't think for a second i wouldn't tell you |
| Weishaus: | this is gonna be sweet, we just need this thing to pop next week |
| | or im out |
| Conradt: | it's gonna blow up |
| Weishaus: | yeah, we're just time strapped |
| | anywya [sic], lets not type |

54.     On that same day, Conradt purchased another 85 shares of SPSS common stock,

followed by another 55 shares on July 27, 2009.

55.     On July 29, 2009, the day after IBM announced its acquisition of SPSS, Conradt

sold his 170 shares.  He realized more than $2,500 in ill-gotten gains from his illegal trading.

56.     Weishaus, who held a much larger SPSS position than Conradt, liquidated some,

but not all, of his SPSS holdings for a nominal profit in the days leading up to the

Announcement, due to a concern about the illegal trading.  After the Announcement, in August

and September 2009, Weishaus liquidated the remainder of his SPSS holdings.  He realized more

than $127,000 in ill-gotten gains from his illegal trading.

**F.     The Downstream Tipping of RR1, RR2, and RR3, Each of Whom Traded on the Basis of the Inside Information.**

*RR1 Trades in SPSS Securities after Learning of the Inside Information.*

57.     At all relevant times, Defendant Conradt, and RR1, RR2, and RR3 each worked

in the Broker's New York City office.  In addition, Conradt, RR1, RR2, and RR3 communicated

regularly.

58.     Weishaus and RR1 attended high school together and spoke frequently by

telephone.

59.    On June 25, 2009, after multiple communications between Weishaus and RR1,
RR1 purchased 20 SPSS July 35 call options.

60.    A few days later, an instant message exchange between Weishaus and Conradt
reflects Weishaus's understanding that RR1 would be trading in SPSS.  Specifically, in a
continuation of the July 1, 2009 instant message exchange described above, paragraph 48, in
which Weishaus observes that someone is "buying spss," Weishaus states:

| | |
|---|---|
| **Weishaus:** | its like [RR1] on the inside |
| **Conradt:** | hahah |
| **Weishaus:** | just hustling money into it. |
| **Conradt:** | making buys from his apt |
| | from his new iphone |

61.    On July 21, 2009, RR1 purchased 20 September 40 SPSS call options.  He
purchased 30 August 40 SPSS call options on the following day.

62.    Brokerage records dating back to April 2006 for the account in which RR1 made
the SPSS trades reflect that, prior to June 24, 2009, RR1 had not traded in SPSS securities, and
that his experience in trading options was limited.

63.    On July 28, 2009, after the Announcement, RR1 sold his SPSS options.  He
realized ill-gotten gains exceeding $44,000 through his trading on Inside Information.

### *RR2 Trades in SPSS Securities After Learning of the Inside Information.*

64.    At relevant times, Defendant Conradt, and RR1, RR2, and RR3 each worked in
the Broker's New York City office.  In addition, Conradt, RR1, RR2, and RR3 communicated
regularly.

65.    Conradt tipped the Inside Information to RR2 sometime prior to July 1, 2009.  In

a July 1, 2009 instant message, Conradt inquired whether RR2 had yet acted on the Inside

Information:

| | |
|---|---|
| **Conradt:** | did you buy options or the stock for our horse, btw? |
| | it's up today |
| | i wanna buy more |
| **RR2:** | no havent yet, im a d***, been distracted |

66.    RR2 began purchasing SPSS securities in late July.  On July 22, 2009, RR2

purchased 100 August 40 SPSS call options and 50 September 40 SPSS call options in his IRA

account.  On July 24, 2009, RR2 purchased another 20 September 40 SPSS calls in his IRA

account, and on July 27, 2009, he purchased 100 August 40 SPSS call options in his personal

account.

67.    RR2's trading in SPSS securities was distinctive in the context of his prior trading

in the same brokerage accounts.  In order to make these purchases, RR2 liquidated most of his

IRA holdings.  By the end of July 2009, SPSS securities constituted more than 99% of RR2's

holdings in his IRA account, and more than 76% of RR2's securities holdings in his personal

brokerage account.

68.    After the Announcement, and specifically, during August 2009, RR2 sold his

SPSS securities.  RR2 realized more than $243,000 in ill-gotten gains through his trading on

Inside Information.

### RR3 Traded in SPSS Securities Upon Learning of the Inside Information.

69.    At relevant times, Defendant Conradt, and RR1, RR2, and RR3 each worked in

the Broker's New York City office.  In addition, Conradt, RR1, RR2, and RR3 communicated

regularly.

70.     On June 25, 2009, just after midnight, RR2 called RR3. They also exchanged text messages throughout the day. On June 26, 2009, RR3 purchased 20 July 35 SPSS call options.

71.     On July 1, 2009, RR2 checked on whether RR3 had acted on the Inside Information: "u move on the stock yet?" RR3 replied: "bought a few of the options but just got liquid today. going to [sic] buying in slowly over this week and next."

72.     Also on July 1, 2009, Weishaus had the following instant message exchange with Conradt: "we should get [RR3] to buy a f***load," to which Conradt responded: "jesus don't tell anyone else … we gotta keep this in the family."

73.     On July 2, 2009 RR3 began to actively buy SPSS options:

| Date | Purchase |
| --- | --- |
| July 2, 2009 | 25 September 40 SPSS call options |
| July 2, 2009 | 25 August 40 SPSS call options |
| July 6, 2009 | 50 September 40 SPSS call options |
| July 7, 2009 | 75 September 40 SPSS call options |
| July 8, 2009 | 100 September 35 SPSS call options |
| July 9, 2009 | 25 September 35 SPSS call options |
| July 9, 2009 | 75 September 40 SPSS call options |
| July 10, 2009 | 25 September 35 SPSS call options |
| July 13, 2009 | 50 September 40 SPSS call options |
| July 14, 2009 | 25 September 35 SPSS call options |
| July 14, 2009 | 50 September 40 SPSS call options |
| July 21, 2009 | 10 September 40 SPSS call options |
| July 22, 2009 | 50 September 40 SPSS call options |

74. On June 26, 2009, RR3 liquidated over $58,000 in an IRA account and took an early distribution, later transferring $50,000 to his personal securities account to fund these purchases. By the end of July 2009, SPSS call options constituted 99% of the holdings in his personal brokerage account. Brokerage records for both his IRA and personal account dating back to April 2007 indicate that his purchases of SPSS option contracts were the first option trades placed in those accounts during that time period.

75. After the Announcement, and specifically, during August and September 2009, RR3 sold his SPSS securities. RR3 realized ill-gotten gains exceeding $606,000 through his trading on Inside Information.

G.   **Subsequent Events**

76. In November 2009, upon receipt of a Commission subpoena, the Broker questioned Weishaus, RR1, RR2, and RR3 regarding their trading in SPSS, including about their respective experience in investing their personal funds in securities options. In response to the Broker's inquiries, each of the registered representatives misrepresented their personal investments in options, seeking to make less obvious the irregularity of their trading in SPSS and thereby, to conceal their illegal trading.

77. On November 6, 2009, the Broker sought further information from the four registered representatives concerning their trades in SPSS. The registered representatives declined to respond to the additional questions and, on November 10, 2009, the Broker terminated all four registered representatives.

78. In or around early November 2010, the Source and the Associate became aware that the Commission was investigating trading surrounding the Announcement.

79.     Shortly thereafter, in November 2010, the Source confessed to the Associate that he had tipped the Inside Information to Conradt. Approximately one week later, the Associate visited the Source at the Source's apartment and observed the Source packing up his belongings. The Source informed the Associate that he was leaving the United States and returning to Australia because, in light of the Commission's investigation, it was his "best option."

**H.     Conradt and Weishaus Each Violated the Federal Securities Laws.**

80.     The Inside Information was material and nonpublic. A reasonable investor would have viewed the Inside Information as being important to his or her investment decision.

81.     The Associate was directly involved with, and aware of, the Inside Information, and knew that the Inside Information was material and nonpublic.

82.     The Associate had a duty to maintain the confidentiality of the Inside Information.

83.     At all relevant times, the Source and the Associate had a relationship of trust and confidence. They had a history, pattern, and practice of sharing confidences.

84.     The Associate disclosed the Inside Information to the Source in the context of their relationship of trust and confidence and expected that the Source would maintain the confidentiality of that information.

85.     At all relevant times, the Source knew or reasonably should have known that the Associate had shared the Inside Information with him with the expectation and understanding that it would be maintained in confidence.

86.     The Source, a securities industry professional, knew or was reckless in not knowing that it was a violation of securities laws to trade in SPSS securities on the basis of the Inside Information, or to disclose that information to others.

18

87. In breach of a duty of trust and confidence that he owed to the Associate, the Source misappropriated the Inside Information from the Associate.

88. The Source knew or was reckless in not knowing that the Inside Information that he misappropriated from the Associate was material and nonpublic.

89. In breach of a duty of trust and confidence that he owed to the Associate, the Source deliberately or recklessly tipped the Inside Information to, at least, Conradt, knowing that there was a reasonable expectation that his tippee(s) would trade on the basis of or tip that information, or recklessly indifferent to the same.

90. At all relevant times, Conradt knew or had reason to know that the Inside Information he received from the Source had been obtained in breach of a fiduciary duty or duty of trust and confidence.

91. Conradt, a securities industry professional with a law degree, knew or was reckless in not knowing that it was a violation of the securities laws to trade on the basis of the Inside Information, or to disclose that information to others.

92. When the Source tipped the Inside Information to Conradt, Conradt assumed a duty to maintain the confidentiality of that information. Conradt knowingly or recklessly breached this inherited duty by tipping, and trading on the basis of, that information.

93. Conradt knew or was reckless in not knowing that the Inside Information tipped to him by the Source was material and nonpublic.

94. Conradt purchased SPSS securities while in possession, and on the basis, of the Inside Information.

95. Conradt knowingly or recklessly traded SPSS securities while in possession, and on the basis of the Inside Information.

96.     Conradt deliberately or recklessly tipped the Inside Information to, at least, Weishaus and RR2, and indirectly to RR3, knowing that there was a reasonable expectation that his tippees would trade on the basis of or tip that information, or recklessly indifferent to the same.

97.     Conradt tipped the Inside Information with the expectation of receiving a benefit and he benefitted from disclosing that information to others, including Weishaus and RR2.

98.     At all relevant times, Weishaus knew or had reason to know that the Inside Information had been obtained in breach of a fiduciary duty or duty of trust and confidence.

99.     Weishaus, a securities industry professional with a law degree, knew or was reckless in not knowing that it was a violation of the securities laws to trade on the basis of the Inside Information, or to disclose that information to others.

100.    When Conradt tipped the Inside Information to Weishaus, Weishaus assumed a duty to maintain the confidentiality of that information.  Weishaus knowingly or recklessly breached this inherited duty by tipping, and trading on the basis of, that information.

101.    Weishaus knew or was reckless in not knowing that the Inside Information tipped to him by Conradt was material and nonpublic.

102.    Weishaus purchased SPSS stock while in possession, and on the basis, of the Inside Information.

103.    Weishaus knowingly or recklessly traded SPSS securities while in possession, and on the basis of the Inside Information.

104.    Weishaus deliberately or recklessly tipped the Inside Information to, at least, RR1, knowing that there was a reasonable expectation that his tippee(s) would trade on the basis of or tip that information, or recklessly indifferent to the same.

105.   Weishaus tipped the Inside Information with the expectation of receiving a benefit and he benefitted from disclosing that information to others, including RR1.

106.   RR1, RR2, and RR3 all purchased SPSS securities on the basis of the tipped Inside Information.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
#### *(Against All Defendants)*

107.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-106, inclusive, as if they were fully set forth herein.

108.   The Inside Information was material and nonpublic.

109.   At all times relevant to this Complaint, each of the Defendants acted knowingly or recklessly.

110.   By engaging in the conduct described above, the Defendants directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

> (a) employed devices, schemes or artifices to defraud; and

> (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

111.   By reason of the foregoing, the Defendants violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants Conradt and Weishaus from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering each Defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### III.

Ordering each Defendant to disgorge all ill-gotten gains or unjust enrichment derived by their direct and indirect tippees as set forth in this Complaint, together with prejudgment interest thereon;

### IV.

Ordering each Defendant to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

## V.

Grant such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

Date: November 29, 2012

*Mary P. Hansen*

Daniel M. Hawke
Elaine C. Greenberg
G. Jeffrey Boujoukos
Mary P. Hansen (MH-9947)
Catherine E. Pappas
A. Kristina Littman

U.S. Securities and Exchange Commission
701 Market Street, Suite 2000
Philadelphia, PA 19106
(215) 597-3100 (Office)
(215) 597-2740 (Fax)
hansenm@sec.gov