UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,    :
                                       :        12 Civ. 8676 (JSR)
        Plaintiff,                     :
                                       :        MEMORANDUM ORDER
        -v-                            :
                                       :
THOMAS C. CONRADT, DAVID J.            :
WEISHAUS, and TRENT MARTIN,            :
                                       :
        Defendants.                    :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

        Plaintiff the Securities and Exchange Commission ("SEC") brings

this action against defendants Thomas C. Conradt, David J. Weishaus,

and Trent Martin for insider trading in violation of Section 10(b)

of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule

10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  In its Second

Amended Complaint ("SAC"), the SEC alleges that the defendants

unlawfully tipped and traded on material nonpublic information

regarding the 2009 acquisition of SSPS Inc. by International

Business Machines Corporation ("IBM").  In particular, the SEC

alleges that in late May 2009, Martin, an equities analyst at a

securities broker-dealer, misappropriated inside information about

the acquisition from a close friend (the "Associate"), who was

working on the transaction as a lawyer at a law firm.  Martin, in

turn, supplied the misappropriated information to Conradt, Martin's

roommate and a registered representative of another broker-dealer,

1

who then tipped the information to Weishaus, who worked at the same broker-dealer as Conradt.   SAC ¶¶ 1-2, 9-11.

Martin now moves to dismiss the SAC on the ground that the SEC has failed to plausibly allege that when Martin tipped Conradt he breached an actionable duty of trust and confidence between Martin and the Associate.   Weishaus, the most remote tippee in this chain, joins in that argument and contends that, in any event, the SEC has failed to plausibly allege that Weishaus knew that the inside information he received was obtained through a breach of any duty of trust and confidence.[1]   For the reasons that follow, the motion is denied.

In ruling on a motion to dismiss, the Court must accept all well-pleaded facts as true and must draw all reasonable inferences in the plaintiff's favor.   See S.E.C. v. Apuzzo, 689 F.3d 204, 207 (2d Cir. 2012).   "To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face."   Id. (internal quotation marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).   In addition, since insider trading is a species of fraud, the facts comprising the fraud must be pleaded with particularity.   Fed. R. Civ. P. 9(b).

So far as pertinent to the motions at hand, the SAC alleges the following facts.   The otherwise unseasoned Associate was a foreign national, who during the relevant period was working in the United

---

[1] Conradt also filed a motion to dismiss, but later withdrew that motion in light of his guilty plea in the parallel criminal case. See ECF No. 35.

States at a New York law firm under an H1B work visa.  SAC ¶ 25.
Martin, an Australian national working as an equities analyst at an
internationally registered broker-dealer, met the Associate in
October 2008 through mutual friends.  Id.  The Associate knew few
other people in New York, and Martin quickly became his closest and
most frequent companion.  Id. ¶ 26.

From December 2, 2008, though the end of May 2009, when Martin
is alleged to have misappropriated the inside information, the two
exchanged hundreds of emails, saw each other regularly, and shared
numerous professional confidences.  Id. ¶¶ 26, 27.  For example, on
at least two occasions, while discussing Martin's work
responsibilities, Martin showed the Associate internal work emails
Martin had written, including one that contained a discussion of
client holdings and communications, which the Associate understood
to be nonpublic and confidential.  Id. ¶ 28. In turn, the Associate
confided in Martin about his work at the law firm, including the
issues he encountered as an associate in the transactional group,
deals on which he had worked or was working, his workload, and other
work issues as they arose.  Id. ¶ 29.  Martin and the Associate
regularly discussed topics such as supervisors, work schedules,
possible new jobs, and compensation, as well as their respective
work as it pertained to current market conditions.  Id.

Martin and the Associate also shared details of a more personal
nature.  Id. ¶ 30.  For instance, Martin confided details to the
Associate regarding the illness of a family member in Australia, and

3

in early May 2009, Martin sought the Associate's advice regarding a friend's legal dispute over a non-compete agreement.  In addition, in June 2009, after the alleged tip, Martin again confided in the Associate after his arrest for a late-night altercation.  At Martin's request, the Associate also attended a call on the matter with Martin's roommate Conradt and a friend of Conradt's who was an assistant district attorney.  Id.

Until May 2009, neither the Associate nor Martin had revealed or traded upon any confidential information exchanged between them. Id. ¶ 31.  Around that time, the Associate was assigned to the IBM-SSPS transaction.  Having worked at the law firm for only eight months and in the mergers and acquisitions practice group for only half that time, the Associate had little experience in this area of practice, but understood that the assignment could have important implications for his career.  Id. ¶ 32.  Accordingly, on May 26, 2009, the Associate met Martin for lunch, seeking "moral support, reassurance, and advice from his friend Martin."  Id. ¶¶ 31-32.  In the course of that lunch, and in connection with conveying to Martin the magnitude and importance of the assignment, the Associate disclosed to Martin material nonpublic information about the IBM-SSPS transaction, including the identities of the two companies involved and the anticipated transaction price.  Id. ¶ 34.  The Associate did not discuss this information with anyone else outside the law firm.  Id. ¶ 35.

4

The SAC alleges that based on Martin's and the Associate's history, pattern, and practice of maintaining confidences, as well as their familiarity with the prohibition against insider trading, the Associate reasonably expected this information to remain confidential, and Martin understood that it was to be held in confidence and not to be traded upon. Id. ¶¶ 36-37. In further support of this contention, the SAC alleges that in prior email correspondence regarding another transaction on which the Associate worked at the law firm, Martin was careful not to refer to a particular target company by its actual name. Id. ¶ 36.

On June 1, 2009, the first business day after his lunch with the Associate, Martin began attempting to trade on the basis of the inside information the Associate had shared. Id. ¶ 41. Within days, Martin acquired 1,500 shares of SSPS common stock, and in late July, he acquired 23 SSPS call options, each of which gave him the right to purchase 100 shares of SSPS stock at a predetermined price at any time before September 29, 2009. Id. ¶¶ 42-44.

On or about July 23, 2009, the day after he acquired the call options, Martin made a series of requests to meet with the Associate, eventually meeting him at the Associate's apartment. Id. ¶ 45. During the meeting, Martin confessed that he had traded on the basis of the inside information that the Associate had shared with him in late May, and apologized profusely. Id. The Associate expressed outrage and demanded that Martin sell all of his SSPS securities immediately. Id. Over the next few days, Martin sold

the SSPS call options and 1,000 of his 1,500 shares of SSPS common stock. Id. ¶ 46. However, Martin still held the remaining 500 shares when the IBM-SSPS merger was announced on July 28, 2009, and he later redeemed these shares for cash, realizing a gain of about $7,600. Id. ¶ 47.

After receiving the inside information from the Associate, Martin supplied the information to Conradt, Martin's friend and roommate, who worked as a registered representative of a Connecticut-based broker-dealer. Id. ¶ 48. Conradt then in turn tipped his friend Weishaus, also a registered representative at the same broker-dealer. Id. Conradt and Weishaus then immediately began trading on the information. As to Weishaus in particular, the SAC alleges that he had never traded in SSPS securities before, but by the end of July, SSPS securities represented over 99% of the equity holdings in his brokerage account and over 90% of his total investment portfolio. Weishaus also held significantly more option contracts in SSPS than he had previously held with respect to any other single security. Id. ¶ 54.

As registered representatives, both Conradt and Weishaus had signed certifications indicating that they understood the legal prohibitions against insider trading. Id. ¶ 49. The SAC also alleges that instant message conversations between Weishaus and Conradt over the month of July indicate that Weishaus knew that he was trading based on misappropriated inside information and that such trading could result in criminal charges. Id. ¶¶ 55-60. For

example, on July 1, 2009, the Weishaus and Conradt exchanged the
following messages:

| | |
|---|---|
| Weishaus: | somebody is buying ssps<br>8000 shares traded<br>hit 34 |
| . . . | |
| Weishaus: | we should get [another registered<br>representative] to buy a f***load |
| Conradt: | jesus don't tell anyone else |
| Weishaus: | like, [the other registered representative] buy<br>100000 shares |
| Conradt: | we gotta keep this in the family |
| Weishaus: | dude, no way<br>i don't want to go to jail<br>f*** that |
| Conradt: | jesus Christ |
| Weishaus: | martha stewart spent 5 months in the slammer |
| Conradt: | does [a friend] know? |
| Weishaus: | and they tried to f*** the mavericks owner |

Id. ¶¶ 55-56.  Another instant message conversation on July 10, 2009
reflects that Weishaus knew that Martin was the source of the
information, and that more information was forthcoming:

| | |
|---|---|
| Weishaus: | we need some turn around on ssps |
| Conradt: | yeah i called trent, gonna get more details<br>tonight<br>he was at work, couldn't talk |

Id. ¶ 57.  Later messages show that Conradt acknowledged his role as
a tipper, that Conradt and Weishaus were expecting a big
announcement with respect to SSPS, and that Martin had cautioned
Conradt "not to tell anyone":

| | |
|---|---|
| Conradt: | i got no options<br>wtf, I'm setting this deal up for everyone |
| Weishaus: | haha |
| Conradt: | makin everyone rich |
| Weishaus: | [a second friend] is gonna put in 50k<br>sept options |
| Conradt: | holy f*** |

7

```
Weishaus:      i tlaked [sic] to him last night
Conradt:       god trent told me not to tell anyone
Weishaus:      ahhaha
               so awesome
Conradt:       big mistake
Weishaus:      eh, we'll get rich
Conradt:       in any case
               i'm just glad to contribute actually
               you guys have done a lot for me, esp you and
               [the second friend]
               i didn't think for a second i wouldn't tell you
Weishaus:      this is gonna be sweet, we just need this thing
               to pop next week
               or im out
Conradt:       it's gonna blow up
Weishaus:      yeah, we're just time strapped
               anywya [sic], let's not type
```

Id. ¶¶ 59-60.  Weishaus later liquidated some of his holding in SSPS
in the days before the IBM-SSPS transaction was announced for a
nominal profit, and then liquidated the remainder afterwards,
realizing gains of more than $127,000. Id. ¶ 63.

After the transaction was announced, Weishaus's employer
questioned him about his SSPS trading.  Weishaus did not disclose
that he had traded on material nonpublic information, and claimed
instead simply to have researched the issuer.  Id. ¶¶ 83-86.  At
around the same time, however, Weishaus admitted to a friend that he
had traded in SSPS securities on the basis of inside information he
had received from Conradt, who in turn had received the information
from his roommate.  Id. ¶ 87.  Weishaus also mentioned that he would
be meeting with some combination of Conradt and three other
registered representatives, but that that they were not supposed to
meet because to do so would "further the conspiracy."  Id.  Weishaus
also stated that the members of this group had bought "burner

8

phones," presumably so that their conversations could not be recorded by authorities. Id.

About a year later, in or around November 2010, Martin and the Associate learned that the SEC was investigating insider trading surrounding the IBM-SSPS transaction. Id. ¶ 88. Martin and the Associate then met again, and Martin confessed that he had not only traded on the information the Associate had shared, but had also tipped it to Conradt. Id. ¶ 89. Crying, Martin again apologized profusely. A week later, Martin left the United States to return to Australia, having told the Associate that that was his "best option." Id.

Under the "misappropriation" theory of insider trading, on which the SEC here relies, it is a violation of Section 10(b) and Rule 10b-5 to misappropriate, for the purpose of trading in securities, material nonpublic information about the securities in breach of a duty owed to the source of the information. United States v. O'Hagan, 521 U.S. 642, 652 (1997). A lynchpin of misappropriation liability therefore is the existence of "a fiduciary duty or similar relationship of trust and confidence" between the tipper and tippee. United States v. Chestman, 947 F.2d 551, 566 (2d Cir. 1991) (en banc). However, "a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information." Chestman, 947 F.2d at 567. Rather, "a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or

where such acceptance may be implied from a similar relationship of trust and confidence between the parties." United States v. Falcone, 257 F.3d 226, 234 (2d Cir. 2001).

Attempting to clarify the circumstances that may give rise to such a confidential relationship, the SEC in 2000 promulgated Rule 10b5-2, entitled "Duties of trust or confidence in misappropriation insider trading cases." See 17 C.F.R. § 240.10b5-2(b). This rule provides that an actionable duty exists in three categories of cases. Here, the SEC relies only on the second category, which provides for an actionable duty

> [w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality.

Id. § 240.10b5-2(b)(2).

In the instant motion, Martin and Weishaus argue that the SEC has failed to plausibly allege the requisite "history, pattern, or practice of sharing confidences" between Martin and the Associate under this rule. Martin and Weishaus contend that instead, the SEC has alleged only a relatively brief friendship between Martin and the Associate, and not the kind of quasi-fiduciary relationship that would give rise to insider trading liability. Martin and Weishaus argue that the bulk of the SEC's allegations merely establish that Martin and the Associate were single foreigners working in the securities arena, that they met and corresponded frequently during

10

the roughly eight-month period between when they were first introduced in October 2008 and when the Associate disclosed the inside information in May 2009, and that they often discussed a variety of work and personal issues.  Martin and Weishaus contend that most plausible inference arising from the allegations is that the Associate divulged the inside information to Martin as a result of the Associate's own negligence, and not as a result of Martin somehow "feigning fidelity to the source of [the] information." O'Hagan, 521 U.S. at 655.

For its part, the SEC points to several factual allegations it contends bring Martin's and the Associate's relationship within Rule 10b5-2(b)(2).  The SEC notes that Martin confided details of a family illness to the Associate, and also sought legal advice on behalf of another friend, in both instances revealing sensitive information about the underlying facts and circumstances.  Martin also allegedly trusted the Associate enough to show him a work email revealing confidential client holdings and communications.  In another email exchange with the Associate, Martin referred to another transaction the Associate was working on, while taking care not to identify the target company by name.  Furthermore, after the alleged tip, Martin also sought the Associate's help and guidance with respect to personal legal troubles.  Finally, and most importantly, after Martin tipped and traded on the inside information the Associate had given him, Martin, in confessing his actions to the Associate, apologized profusely, once in tears.

Martin and Weishaus acknowledge that the SAC pleads these allegations, but argue that they do not suffice to plausibly indicate that Martin and the Associate's bond went beyond mere friendship into an actionable relationship of trust and confidence. The argument is not without force. Much of the SAC relies heavily on labels, such as variations on the word "confide." Moreover, the relatively brief duration of Martin and the Associate's acquaintance cuts against an inference that they had the requisite "history, pattern, or practice of sharing confidences." See Chestman, 947 F.2d at 569.

But on a motion to dismiss, while the Court must satisfy itself that the complaint raises a plausible claim, the Court, in making that determination, must draw every reasonable inference favorable to plaintiffs arising from the well-pleaded facts. Here, the sensitive nature of many of the personal and professional confidences shared between Martin and the Associate bespeak an implicit mutual understanding of confidentiality. The existence and strength of that understanding was starkly confirmed when, after Martin initially confessed his trading to the Associate, the Associate expressed outrage and demanded that Martin immediately sell off his SSPS holdings, a demand with which Martin substantially complied. And if the nature of the confidentiality were still in doubt, such doubts were resolved in favor of the SEC's view when Martin, again confronted by the Associate, tearfully confessed his breach of their confidentiality when he not only traded on the

12

inside information, but also tipped it to others. Such emotional apologies would have been unnecessary, and indeed out of place, if Martin had not understood that the Associate expected Martin not to tip or trade on the information the Associate had shared with Martin.

Accordingly, viewing the facts in the light most favorable to the SEC, and drawing all reasonable inferences in the SEC's favor, the Court concludes that the SEC has adequately pleaded, more plausibly than any other inference, that Martin and the Associate had a sufficient history, pattern, or practice of sharing confidences that they mutually expected and understood that the information disclosed was not to be tipped or traded upon.

While this is sufficient to deny Martin's motion, Weishaus, as a remote tippee, argues that, even if an actionable duty of trust and confidence existed between Martin and the Associate, the SAC fails to plausibly allege that Weishaus knew or should have known that the inside information on which he traded, whose immediate source was Martin's roommate Conradt, was obtained in violation of such a duty. "[A] tippee must have some level of knowledge that by trading on the information the tippee is a participant in the tipper's breach of fiduciary duty," S.E.C. v. Obus, 693 F.3d 276, 287 (2d Cir. 2012), but in an SEC civil enforcement case, this requirement is met "if a tippee knew or had reason to know that confidential information was initially obtained and transmitted improperly (and thus through deception)." Id. at 288.

13

Here, although the SAC alleges that Weishaus knew that Conradt
had received his information from Martin, there is no allegation
that Weishaus even knew of the existence of the Associate, let alone
knew that the Associate and Martin had a relationship of trust and
confidence or that Martin had obtained the information in breach of
that relationship.  But as the SEC points out, the SEC is not
required to show "that a remote tippee knew for certain how the
initial breach of fiduciary duty occurred," SEC v. Thrasher, 152 F.
Supp. 2d 291, 304 (S.D.N.Y. 2001), but only that "the tipper's
conduct raised red flags that confidential information was being
transmitted improperly." Obus, 693 F.3d at 288.  Here, the instant
messages between Weishaus and Conradt, both highly sophisticated
tippees with knowledge of the securities markets and of the
prohibition against insider trading, more than substantiate
Weishaus's recognition that he was receiving, and trading on,
unlawfully obtained information.  For example, Conradt not only told
Weishaus that Conradt's information came from Martin, but also that
Martin had warned Conradt "not to tell anyone."  Likewise, the chat
logs show Weishaus and Conradt openly discussing the possibility
that their use of Martin's information could result in criminal
insider trading charges.  Furthermore, after the fact, Weishaus
referred to his trading in concert with others as a "conspiracy,"
told a friend that his associated traders had purchased "burner
phones" (presumably to avoid monitoring by authorities), and lied
about his trading activity to his employer.  Taken together, these

14

allegations more than plausibly indicate that Weishaus knew that Martin and Conradt had obtained and transmitted the information to him improperly.

Accordingly, for the foregoing reasons, Martin's and Weishaus's motions to dismiss are denied in full.  The Clerk of the Court is directed to close document number 22 on the docket of this case.

SO ORDERED.

Dated:   New York, NY
         June 4, 2013          JED S. RAKOFF, U.S.D.J.

15