UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

        v.

THOMAS C. CONRADT,
DAVID J. WEISHAUS, and
TRENT MARTIN,

                  Defendants.

Civil Action No. 12-cv-08676-JSR

ECF CASE

---

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT
AGAINST DEFENDANT DAVID J. WEISHAUS**

SECURITIES AND EXCHANGE COMMISSION
G. Jeffrey Boujoukos
Catherine E. Pappas
A. Kristina Littman
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA 19106
(215) 597-3100

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................................iv

I.    INTRODUCTION .....................................................................................1

II.   BACKGROUND .......................................................................................2

      A. The Civil Action ................................................................................2

      B. The Criminal Action...........................................................................2

III.  STATEMENT OF FACTS .......................................................................3

      A. IBM's Acquisition of SPSS ...............................................................3

      B. Prior to the End of May 2009, Martin and Dallas Had a History of Sharing
         Confidences ........................................................................................4

      C. The Relationship Between Martin and Dallas was such that Martin Knew that Dallas
         Disclosed to him Material, Nonpublic Information About the SPSS Acquisition in
         Confidence...........................................................................................6

      D. Martin Tipped Conradt, Conradt Tipped Weishaus, and Weishaus Illegally Traded in
         SPSS Securities on the Basis of the Information Tipped by Conradt ............................7

      E. Weishaus's Contemporaneous Communications with Conradt Reflect Both an
         Expectation of Profit and an Awareness of Wrongdoing.............................................10

      F. After Illegally Trading, Weishaus Met with Conradt and Others to Discuss Their
         Trading................................................................................................12

IV.   ARGUMENT

      A. Insider Trading Violates Section 10(b) of the Exchange Act and Rule 10b-5
         Thereunder..........................................................................................14

         1. Martin Breached a Duty of Trust and Confidence Owed to Dallas When He
            Tipped the Inside Information to Conradt ........................................................15

         2. Conradt Inherited Martin's Duty and Tipped Weishaus ..................................16

         3. Weishaus Knew or Had Reason to Know that the Information Tipped to Him
            by Conradt was Obtained Through the Tipper's Breach of Duty....................17

4. The Information Tipped by Conradt to Weishaus Was Material and Nonpublic ............................................................................................ 18

5. Weishaus Knew that the Information Tipped to Him by Conradt was Material and Nonpublic and Intentionally or Recklessly Traded on the Basis of that Information for His Own Benefit .................................................................. 20

B. This Court Should Permanently Enjoin Weishaus from Future Violations, and Order Him to Pay Disgorgement, Prejudgment Interest, and the Maximum Civil Penalty ... 22

1. Weishaus Should be Permanently Enjoined from Future Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder .................................. 22

2. Weishaus Should be Ordered to Disgorge his Ill-gotten Profits from His Illegal Trading, Plus Prejudgment Interest ...................................................... 23

3. Weishaus Should be Directed to Pay a Civil Penalty Equal to Three Times his Illegal Profits, or $382,455 ............................................................................ 24

V. CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                      <u>Page(s)</u>

<u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242 (1986).................................................13, 14

<u>Basic Inc. v. Levinson</u>, 485 U.S. 224 (1988).........................................................................19

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) ...................................................................13

<u>Dirks v. SEC</u>, 463 U.S. 646 (1983) .............................................................................14, 18

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986) ..................13, 14

<u>SEC v. Conradt</u>, No. 12 Civ. 8676, 2013 U.S. Dist. LEXIS 78381
(S.D.N.Y. June 4, 2013) .............................................................................2, 16, 17-18, 20

<u>SEC v. Aronson</u>, No. 11 Civ. 7033, 2013 U.S. Dist. LEXIS 114687
(S.D.N.Y. Aug. 6, 2013)...............................................................................................13

<u>SEC v. Cavanaugh</u>, 155 F.3d 129 (2d Cir. 1998)..............................................................22

<u>SEC v. Contorinis</u>, No. 09 Civ. 1043, 2012 U.S. Dist. LEXIS 19961
(S.D.N.Y. Feb. 3, 2012)................................................................................................22

<u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450 (2d Cir. 1996),
*cert. denied* 522 U.S. 812 (1997) ...............................................................................23, 24

<u>SEC v. Gupta</u>, No. 11 Civ. 7566, 2013 U.S. Dist. LEXIS 102274,
(S.D.N.Y. Jul. 17, 2013)......................................................................................22, 24, 25

<u>SEC v. Haligiannis</u>, 470 F. Supp. 2d 373 (S.D.N.Y. 2007) ........................................23, 24

<u>SEC v. MacDonald</u>, 699 F.2d 47 (1st Cir. 1983) ...............................................................23

<u>SEC v. Mayhew</u>, 121 F.3d 44 (2d Cir. 1997)...................................................18, 19, 20, 21

<u>SEC v. Moran</u>, 944 F. Supp. 286 (S.D.N.Y. 1996) ............................................................24

<u>SEC v. Obus</u>, 693 F.3d 276 (2d Cir. 2012) ...................................13, 14, 15, 17, 18, 19, 20

<u>SEC v. Patel</u>, 61 F.3d 137 (2d Cir. 1995).........................................................................23

<u>SEC v. Rajaratnam</u>, 822 F. Supp. 2d 432 (S.D.N.Y. 2011) ........................................24, 25

<u>SEC v. Thrasher</u>, 152 F. Supp. 2d 291 (S.D.N.Y. 2001)....................................................17

## TABLE OF AUTHORITIES (Continued)

**CASES**                                                                    **Page(s)**

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998) ...................................................21, 23

U.S. v. Conradt, No. 12 Crim. 887 (S.D.N.Y. Nov. 28, 2012) ...........................................3

U.S. v. Cusimano, 97 F.3d 663 (2d Cir. 1996),
*cert. denied*, 138 L. Ed. 2d 1013 (1997)................................................................18

U.S. v. Larrabee, 240 F.3d 18 (1st Cir. 2001) ...................................................21

U.S. v. O'Hagan, 521 U.S. 642 (1997)....................................................14, 15, 25

U.S. v. Whitman, 904 F. Supp. 2d 363 (S.D.N.Y) .......................................15, 16


**Rules and Statutes**                                                       **Page(s)**

Federal Rule of Civil Procedure 1 .....................................................13

Federal Rule of Civil Procedure 56(a).................................................13

15 U.S.C. § 78j(b)............................................................................2, 14

15 U.S.C. § 78u-1 ...........................................................................24

15 U.S.C. § 78u-1(a)(2).....................................................................24

17 C.F.R. § 240.10b5.......................................................................2, 14

17 C.F.R. § 240.10b5-2(b)(2) ..........................................................15, 16

## I.   INTRODUCTION

This case concerns illegal insider trading and tipping ahead of International Business Machines Corporation's ("IBM") 2009 acquisition of SPSS Inc. ("SPSS") (the "SPSS Acquisition"). In its Second Amended Complaint (the "Complaint"), the Securities and Exchange Commission (the "Commission") alleges that defendant Trent Martin ("Martin") misappropriated material nonpublic information about the SPSS Acquisition from his close friend, Michael Dallas ("Dallas"), an associate at a New York law firm (the "Law Firm") who worked on the SPSS Acquisition. Martin purchased SPSS securities on the basis of that information and tipped his friend and roommate, Thomas Conradt ("Conradt"). Conradt, a law school graduate and registered representative at a Connecticut-based registered broker-dealer (the "Broker"), purchased SPSS securities and tipped his co-worker David Weishaus ("Weishaus"), also a law school graduate and registered representative of the Broker.

Both Martin and Conradt have pled guilty to parallel criminal charges and, subject to the approval of the Commission and this Court, the staff of the Commission has reached terms of settlement with both of those defendants. The Commission now respectfully submits that summary judgment is appropriate with respect to its claims against defendant Weishaus. In sum, the uncontested facts, including admissions of the defendants, testimony, affidavits and declarations, records of communications, and other evidence establish that Weishaus illegally traded in the securities of SPSS on the basis of material and nonpublic information, thereby making judgment at this time appropriate.

## II.     BACKGROUND

### A.     The Civil Action

The Commission instituted the Civil Action on November 29, 2012, ultimately charging

all three defendants with violations of Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder, and

seeking injunctive relief, as well as disgorgement with prejudgment interest, and civil penalties.[1]

On February 20, 2013, Weishaus filed a motion to dismiss the complaint, arguing that the

complaint failed to allege a breach of duty by Martin or Weishaus's knowledge of that breach.

Conradt joined in Weishaus's claims as to the allegations of breach of duty.  The Commission

voluntarily amended its complaint and Weishaus moved to dismiss on the same grounds.  Both

Conradt and Martin joined in that motion to the extent it contested the nature and sufficiency of

the relationship between Dallas and Martin.  At oral argument on that motion, Conradt, who had

recently pled guilty to the parallel criminal charges, withdrew his joinder in the motion to

dismiss.  On June 4, 2013, the Court denied the motion to dismiss, finding that the Second

Amended Complaint adequately alleged both a breach of duty and Weishaus's knowledge of the

breach of duty.[2]

### B.     The Criminal Action

On November 28, 2012, the United States Attorney for the Southern District of New

York filed a criminal indictment against Conradt and Weishaus based on the facts underlying this

---

[1]     The Commission amended the Complaint on December 26, 2013, after Trent Martin's
arrest in Hong Kong, to name defendant Martin.  The Commission filed a Second Amended
Complaint on March 4, 2013.  Docket No. 20.

[2]     SEC v. Conradt, 2013 U.S. Dist. LEXIS 78381 (June 4, 2013 S.D.N.Y.).

civil action, charging each with securities fraud and conspiracy to commit securities fraud.  U.S.
v. Conradt, 12 Crim. 887 (S.D.N.Y.).  On December 26, 2012, the grand jury issued an
indictment against Martin, again charging conspiracy to commit securities fraud and securities
fraud.  On April 3, 2013, Conradt pled guilty to criminal charges of securities fraud and
conspiracy to commit securities fraud, and on September 12, 2013, Martin pled guilty to one
count of conspiracy to commit securities fraud.  Statement at ¶¶ 67, 68.[3]

## III.     STATEMENT OF FACTS

### A.     IBM's Acquisition of SPSS

On or about January 23, 2009, IBM retained the Law Firm in connection with its possible
acquisition of SPSS (the "Engagement").  Statement at ¶ 1.  In early April 2009, IBM informed
SPSS that IBM had an interest in making an offer to purchase SPSS, culminating in an April 15,
2009 letter from IBM to SPSS setting forth a non-binding offer to purchase SPSS.  Statement at
¶ 2.  On May 26, 2009, SPSS and IBM entered into a supplemental agreement to an existing
confidentiality agreement in advance of IBM commencing due diligence.  Statement at ¶ 3.

Dallas, a New Zealand citizen, began working at the Law Firm in September 2008
pursuant to a H1B Work Visa.  Statement at ¶ 4.  He was initially assigned to the Commercial
Banking practice group and rotated to the Mergers and Acquisitions ("M&A") Practice Group in
December 2008, although he did not begin M&A work until February 2009.  Statement at ¶ 5.
On or about May 26, 2009, the Law Firm assigned Dallas to work on the Engagement and he
continued to work on the Engagement through its completion on October 2, 2009.  Statement at ¶
6.

---

[3]     The facts set forth herein are supported by the Commission's Statement of Undisputed
Material Facts Pursuant to Local Civil Rule 56.1, referenced as "Statement at ¶ ___," and the
Exhibits referenced therein.

The confidentiality of information relating to the possible acquisition was carefully safeguarded by the participants. Statement at ¶ 7. As part of the team working on the Engagement, Dallas became privy to information such as the anticipated (per share) purchase price and the identity of the parties to the transaction, which he knew to be nonpublic. Statement at ¶ 8. On June 6, 2009, the Law Firm sent SPSS's counsel an initial draft of a merger agreement. Statement at ¶ 9. On July 27, 2009, SPSS and IBM executed the merger agreement and at 7:31 a.m. on July 28, 2009, IBM and SPSS issued a joint press release announcing to the public the acquisition (the "Announcement"), in which IBM would acquire SPSS in an all cash transaction for approximately $1.2 billion or $50 per share (the "SPSS Acquisition").[4] Statement at ¶¶ 10-11.

On July 27, 2009, the last trading day prior to the Announcement, the closing price of SPSS stock was $35.09. Statement at ¶ 13. On July 28, 2009, the day of the Announcement, SPSS's stock closed at $49.45 per share on heavy volume, an increase of 40.9% from the previous day's closing price. Statement at ¶ 14.

**B.    Prior to the End of May 2009, Martin and Dallas Had a History of Sharing Confidences.**

Both Martin and Dallas acknowledge that they had a history of sharing confidences prior to the end of May 2009. Statement at ¶ 18.

They met in October 2008 through mutual friends, and became close friends. Statement at ¶¶ 15, 17. At the time, Dallas had recently moved to New York, and Martin became Dallas's closest friend in New York and the person outside of his employment with whom Dallas spent

---

[4]        The acquisition was completed on October 2, 2009. Statement at ¶ 12.

the most time.  Statement at ¶¶ 15-17.

From December 2, 2008 through the end of May 2009 (the time when Martin is alleged to have misappropriated from Dallas material, nonpublic information), Martin and Dallas directed more than two hundred e-mails to each other, both individually and as part of a small group of friends.  Statement at ¶ 19.  They exchanged confidential details about their personal and professional lives, relying on each other as friends for support and advice.  Statement at ¶¶ 20-28.  During this time period, Martin showed Dallas at least one internal, nonpublic work e-mail written by Martin, which Dallas understood to be nonpublic.  Statement at ¶ 21.  Moreover, Dallas confided in Martin regarding his work at the Law Firm, including discussions of what he did as an associate working in the business and transactional groups, transactions on which he had worked or was working, his workload, and work issues as they arose.  Statement at ¶¶ 22, 24.  For example, in or around February 2009, after Dallas had informed Martin about his reassignment to the M&A practice group, he told Martin about a bond transaction on which he was working, including details that Martin knew to be nonpublic and confidential.  Statement at ¶ 23.  They also discussed their personal views regarding their supervisors, work schedules, and compensation.  Statement at ¶ 25.

Prior to May 2009, Martin and Dallas also shared confidences of a more personal nature, including details of relationships, their families, and plans for the future.  Statement at ¶ 26.  So for instance, prior to May 2009, Dallas recalls that Martin confided in him personal details regarding the illness of a family member in Australia.  Statement at ¶ 26.  Moreover, in early May 2009, Martin sought out Dallas's advice regarding a friend's legal dispute over an employment non-compete agreement, revealing to Dallas the underlying facts and legal strategies, to which Dallas responded in detail.  Statement at ¶ 27.  In June 2009, Martin again

confided in Dallas after his arrest on a personal legal problem that had implications regarding his ability to remain in the United States. Statement at ¶ 28.

Dallas and Martin each expected the other to maintain their confidences. Statement at ¶ 29. Over the course of their friendship, Dallas never revealed, or traded on, any confidential information that Martin shared with him; and prior to June 2009, Martin did not reveal or trade on the confidences entrusted to him by Dallas. Statement at ¶¶ 30-31.

**C.   The Relationship between Martin and Dallas was such that Martin Knew that Dallas Disclosed to him Material, Nonpublic Information About the SPSS Acquisition in Confidence.**

At the time of his assignment to the Engagement in late May 2009, Dallas had been employed by the Law Firm for only eight months and had been working on M&A assignments for approximately three months. Statement at ¶ 32. The Engagement was his first start-to-finish M&A project and, for the first time, he was advising a principal to the transaction. Statement at ¶ 32. Dallas understood IBM to be one of the Law Firm's largest clients, he anticipated that the work on the Engagement would be very demanding, and he was concerned that his lack of experience might result in poor performance on the Engagement. Statement at ¶ 33. So when Dallas met Martin for lunch in late May 2009 (the "Lunch"), Dallas's new assignment was a topic of discussion between the two men, with Dallas seeking moral support, reassurance, and advice from his friend Martin. Statement at ¶¶ 34-35.

During the Lunch, Dallas revealed to Martin nonpublic information about the SPSS Acquisition, including the anticipated transaction price and the identities of the acquiring and target companies (the "Disclosure"). Statement at ¶ 36. Dallas revealed this information (the "Inside Information") in an attempt to communicate to Martin the magnitude and importance of the Engagement and his concerns about his inexperience. Statement at ¶ 37. Dallas did not

6

discuss this information with anyone outside of the Law Firm other than Martin.  Statement at ¶ 38.

Based on, among other things, their history of sharing and maintaining confidences, Martin's sophistication as a professional in the securities industry, and Martin's knowledge of Dallas's position at the Law Firm, Dallas expected Martin to maintain the Inside Information in confidence.[5]  Statement at ¶ 38.  In fact, at the time of the Disclosure, Martin knew that the Inside Information was nonpublic, knew that the public release of the Inside Information would affect the price of SPSS securities, and admits that his friend, Dallas, disclosed the Inside Information to him with the expectation that that he keep it in confidence and not tell anyone.[6]  Statement at ¶ 40.

**D.**    **Martin Tipped Conradt, Conradt Tipped Weishaus, and Weishaus Illegally Traded in SPSS Securities on the Basis of the Information Tipped by Conradt.**

Prior to June 24, 2009, Martin told his roommate, Conradt, that SPSS was a likely acquisition target, Martin was considering trading in SPSS securities, and that the information

---

[5]    From 2008 through mid-September 2009, Martin worked in New York as an Equities Salesman with a broker dealer.  By the end of January 2009, he had passed the General Securities Representative Examination ("Series 7 Exam") and the Uniform Securities Agent State Law Examination ("Series 63 Exam").  On January 26, 2009, he certified to his broker employer that he had reviewed and would comply with all of its policies, including policies explaining and prohibiting trading on the basis of material nonpublic information.  Statement at ¶ 16.

[6]    Not only does Martin admit that he understood Dallas expected him to keep the information confidential; his later apologies confirm his understanding.  On or about July 23, 2009, at Martin's request, he and Dallas met at Dallas's apartment where Martin first told Dallas that he traded on the basis of the Inside Information.  At that meeting, Martin apologized to Dallas for trading on the basis of the Inside Information.  Statement at ¶ 42.  He again apologized to Dallas in June 2011, in a Facebook message.  Statement at ¶ 43.

about SPSS was confidential and should not be disclosed to anyone else.[7]  Statement at ¶ 44.  At the time, Conradt held a law degree, had passed his Series 7 and 63 Exams, was employed as a registered representative at the Broker, and had signed an Insider Trading Certification for the Broker affirming his understanding of the Broker's policies and procedures regarding insider trading.  Statement at ¶¶ 45, 50.  He understood SPSS to be a publicly traded company, and based on what Martin told him, including that the information was confidential and should not be shared with anyone else, understood that Martin should not have shared it with him.  Statement at ¶ 46.  Notwithstanding, Conradt immediately tipped Weishaus, disclosing the substance of his conversations with Martin about SPSS -- that SPSS was likely to be acquired, that Martin was going to trade in SPSS securities, and that the information was confidential – and they both traded as described below.[8]  Statement at ¶¶ 47, 51, 52.  At the time, Weishaus, like Conradt, held a law degree, was a registered representative associated with the Broker, had signed an Insider Trading and Certification, and had passed his Series 7 and 63 Exams.  Statement at ¶¶ 48-50.

On June 24, 2013, Weishaus purchased 250 shares of SPSS common stock in his brokerage account ending in 0255 (his "brokerage account").  Statement at ¶ 51.  The next day,

---

[7]   Martin first purchased SPSS securities on June 3, 2009, prior to any discussion with Conradt about the SPSS Acquisition.  Statement at ¶ 41.  After this purchase, but prior to June 24, 2009, Martin recalls telling Conradt the identity of the likely target of the likely transaction, SPSS; the acquirer, IBM; the anticipated transaction price, and that the information was from a confidential source.  See Exhibit 9 to the Statement at ¶ 22.  Conradt recalls learning from Martin the identity of the target, that Martin was considering trading, and that the information was confidential and Conradt should not tell anyone.  Statement at ¶ 46.  Conradt first purchased SPSS securities on June 26, 2009.  Statement at ¶ 52.

[8]   Conradt states that he discussed the information provided to him by Martin with Weishaus in order to repay Weishaus for all the times that Weishaus had helped him, and for being a good friend.  Statement at ¶ 47.

when SPSS stock was trading around $32.71 per share, Weishaus purchased 50 SPSS calls in his brokerage account with an expiration date of September 19, 2009, and a strike price of $40. Statement at ¶ 52. On June 26, 2006, Conradt also began purchasing SPSS securities. Statement at ¶¶ 52, 58. On June 29, 2009, when SPSS stock was trading around $32.94 per share, Weishaus purchased 50 SPSS calls in his brokerage account with an expiration date of July 18, 2009, and a strike price of $35. Statement at ¶ 53.

Prior to July 22, 2009, Conradt admits that Martin revealed to him the identity of the acquiring company in the SPSS Transaction (IBM) and indicated that the transaction would occur soon. Conradt also passed this information on to Weishaus. Statement at ¶¶ 54, 60-62.

On July 22, 2009, following the exchange of nine text messages between Conradt and Weishaus, and at a time when SPSS stock was trading around $34.38 per share, Weishaus purchased 100 SPSS calls in his brokerage account expiring September 19, 2009, with a strike price of $40. Statement at ¶ 55.

At the time of the Announcement on July 28, 2009, Weishaus held 143 SPSS option contracts.[9] Statement at ¶ 56. Over the two months following the Announcement, Weishaus sold all of his SPSS holdings for profit, resulting in ill-gotten gains of $127,485. Statement at ¶¶ 56-57. Records from the brokerage account dating back to April 2007 reflect that Weishaus had not traded in SPSS securities in that account prior to June 24, 2009.[10] Statement at ¶ 58. Moreover, before his purchases of SPSS call options, Weishaus had not previously held in his brokerage account so many "out of the money" options, meaning (in the context of call options)

---

[9]     Prior to the Announcement, some of Weishaus's SPSS option contracts had expired, and he had liquidated certain of his other SPSS holdings. Statement at ¶ 56.

[10]    Records of Conradt's brokerage account similarly reflect that his June SPSS transactions were his first trades in SPSS securities. Statement at ¶ 58.

options with strike prices higher than the current market value of the stock.  Statement at ¶ 59.

**E.      Weishaus's Contemporaneous Communications With Conradt Reflect Both an Expectation of Profit and an Awareness of Wrongdoing.**

Weishaus understood that trading on the basis of material, inside information, was a

violation of federal and state securities laws and of the Broker's internal policies, having worked

in the securities industry since, at least, 2007 and signed an "Insider Trading Certification" for

the Broker in November 2007.  Statement at ¶¶ 48-50.  His instant message dialogue with

Conradt demonstrates that Weishaus traded in SPSS securities with knowledge that he had

nonpublic information about SPSS, knew Martin was the source of that information, expected

the price of SPSS stock to rise and to profit from his trading in SPSS securities, and realized the

possibility that his trading could result in criminal charges.  Statement at ¶¶ 60-63.

For instance, on Wednesday, July 1, 2009, just days after their initial trading in SPSS

securities, Weishaus sent the following instant message to Conradt:

| | |
|---|---|
| **Weishaus:** | somebody is buying spss |
| | 8000 shares traded |
| | hit 34[,] |
| **Conradt:** | damn |
| **Weishaus:** | its like [RR1], on the inside |
| **Conradt:** | hahah |
| **Weishaus:** | just hustling money into it |
| | so funny |
| **Conradt:** | making buys from his apt |
| | from his new iphone |
| **Weishaus:** | we should get [RR3] to buy a f***load |
| **Conradt:** | jesus don't tell anyone else |
| **Weishaus:** | like, [RR3], buy 100,000 shares |
| **Conradt:** | we gotta keep this in the family |
| **Weishaus:** | dude, no way |
| | i don't want to go to jail |
| | f*** that |
| **Conradt:** | jesus christ |
| **Weishaus:** | martha stewart spent 5 months in the |
| | slammer |
| **Conradt:** | does [friend] know? |

> **Weishaus:**    and they tried to f*** the mavericks owner

Statement at ¶ 60.

Despite their concern regarding criminal liability, their exchange later that same day

further evidences their excitement at the prospect of anticipated profits:

| | |
|---|---|
| **Weishaus:** | jesus we need spss to run up |
| | i need that lexus |
| **Conradt:** | we can't afford not to buy this |
| **Weishaus:** | ha |
| | should i buy more spss |
| | the options are running now |
| **Conradt:** | f*** yes |
| **Weishaus:** | it's getting expensive |
| | i have another 9k to deploy |
| | just go for broke |
| | wow |
| | aggressive |
| **Conradt:** | i'm about to deposit another 1k to my [brokerage] |
| **Weishaus:** | haha |
| **Conradt:** | jesus i need a bailout. |

Statement at ¶ 61.

Moreover, communications on July 10, 2009 evidence Weishaus's knowledge that Martin

is the source of the Inside Information, as well as an expectation of additional information from

that source:

| | |
|---|---|
| **Weishaus:** | we need some turn around on spss |
| **Conradt:** | yeah i called trent, gonna get more details |
| | he was at work, couldn't talk |

Statement at ¶ 62.

Almost two weeks later, on July 23, 2009, the day after Weishaus's purchase of

additional SPSS call option contracts, Conradt and Weishaus's discuss Conradt's motivation in

tipping the Inside Information to Weishaus and others, as well as the confidentiality of the

information and their expectation of imminent profits:

| | |
|---|---|
| **Conradt:** | f*** it i'm sending you another grand |
| | i want in on these options |
| | i am amazed  [brokerage firm] is letting me buy on |
| | margin |
| **Weishaus:** | dude, f*** that |
| | send it ot [sic] [brokerage firm] |
| | youre [sic] gonna stick me with the taxes |
| **Conradt:** | i got no options |
| | wtf, i'm setting this deal up for everyone |
| **Weishaus:** | haha |
| **Conradt:** | makin everyone rich |
| **Weishaus:** | [a second friend] is gonna put in 50k |
| | sept options |
| **Conradt:** | holy f*** |
| **Weishaus:** | i tlaked [sic] to him last night |
| **Conradt:** | god trent told me not to tell anyone |
| **Weishaus:** | ahhaha |
| | so awesome |
| **Conradt:** | big mistake |
| **Weishaus:** | eh, we'll get rich |
| **Conradt:** | in any case |
| | i'm just glad to contribute actually |
| | you guys have done a lot for me, esp you and [the |
| | second friend] |
| | i didn't think for a second i wouldn't tell you |
| **Weishaus:** | this is gonna be sweet, we just need this thing to |
| | pop next week |
| | or im out |
| **Conradt:** | it's gonna blow up |
| **Weishaus:** | yeah, we're just time strapped |
| | anywya [sic], lets not type |

Statement at ¶ 63.

## F.   After Illegally Trading, Weishaus Met with Conradt and Others to Discuss Their Trading.

On July 28, 2009, the day of the Announcement, Conradt met with Weishaus and others in a room at the Morgans Hotel in New York.  The purpose of the meeting was to formulate a cohesive plan about what to do if they were contacted by the Commission or other law enforcement.  At that meeting Weishaus and others acknowledged trading on the basis of, and profits from, the information about the SPSS Acquisition that had originated with Martin and

passed through Conradt.  Statement at ¶ 64.

## IV.    ARGUMENT

Federal Rule of Civil Procedure 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense – or
> the part of each claim or defense – on which summary judgment is sought.  The
> court shall grant summary judgment if the movant shows that there is no genuine
> dispute as to any material fact and the movant is entitled to judgment as a matter
> of law.  The court shall state on the record the reasons for granting or denying the
> motion.

*See also* Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986); SEC v. Aronson, No. 11

Civ. 7033, 2013 U.S. Dist. LEXIS 114687, at *3 (S.D.N.Y. Aug. 6, 2013).  Granting summary

judgment avoids unnecessary and protracted litigation by permitting prompt resolution of

controversies on their merits, without a trial, where there are no genuine issues of material fact.

*See* Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  As stated by the United States Supreme

Court: "[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to

secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at

327, *quoting* Fed. R. Civ. P. 1.

On a motion for summary judgment, the court must view the record as a whole and in the

light most favorable to the non-moving party, and resolve all ambiguities and draw all justifiable

inferences in favor of the non-moving party.  *See* Anderson, 477 U.S. at 255; SEC v. Obus, 693

F.3d 276, 284 (2d Cir. 2012); Aronson, 2013 U.S. Dist. LEXIS 114687, at *3, *38.  Once the

moving party makes the required showing, the burden shifts to the non-moving party who "must

do more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

To defeat a summary judgment motion, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. Matsushita Elec., 475 U.S. at 587. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita Elec. 475 U.S. at 587; *cf.* Obus, 693 F.3d at 284, *quoting* Anderson, 477 U.S. at 248 ('summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'); Aronson, 2013 U.S. Dist. LEXIS 114687, at *3-4 (same). [11]

There is no genuine dispute with respect to the Commission's claim that Weishaus illegally traded in SPSS securities on the basis of material, nonpublic information. Accordingly, the Commission is entitled to summary judgment on this claim.

## A.    Insider Trading Violates Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder.

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit *deception* in connection with the purchase or sale of securities. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The Supreme Court has recognized that insider trading – *i.e.* tipping or trading on the basis of material nonpublic information – is prohibited when done with deception. *See* Dirks v. SEC, 463 U.S. 646, 654 (1983). A person who obtains material nonpublic information, and tips or trades on the basis of that information, without disclosure, and in breach of a duty of trust and confidence, to the source, as Martin is alleged to have done in this case, acts with deception. U.S. v. O'Hagan, 521 U.S. 642, 652 (1997) (emphasis added, citation omitted); *see also* Obus, 693 F.3d at 284-85;

---

[11]    Defendant Weishaus asserted his rights under the Fifth Amendment in response to the Second Amended Complaint (docket no. 41), in sworn investigative testimony before the staff of the Commission, and at a deposition in this civil action. The Commission is not relying on an adverse inference from these assertions, *see, e.g.,* Aronson, 2013 U.S. Dist. LEXIS at *38, but notes that under applicable law, to defeat summary judgment, defendant Weishaus must come forward with specific facts showing that there is a genuine issue for trial.

U.S. v. Whitman, 904 F. Supp. 2d 363, 366-67 (S.D.N.Y.).  The requirement that the fraud be "in
connection with the purchase and sale of any security" is satisfied because the information "is of
a sort that [can] ordinarily [be] capitalize[d] upon to gain no-risk profits through the purchase or
sale of securities."  Obus, 693 F.3d at 285, *quoting* O'Hagan, 521 U.S. at 656.

As observed by the Second Circuit in Obus, Section 10(b) and Rule 10b-5 also reach
tipping chains.  Obus, 693 F.3d at 285, 288.  In such cases, the tippee(s) are said to "inherit" the
duty of the initial tipper to abstain or disclose -- the duty of trust or confidence owed by Martin
to Dallas caused by their history, pattern, and practice of sharing confidences in the case at bar.
To be liable under this theory:

> (1) The tipper [must have] breached a duty by tipping confidential information;
> (2) the tippee knew or had reason to know that the tipper improperly obtained the
> information (*i.e.* that the information was obtained through the tipper's breach);
> and (3) the tippee, while in knowing possession of the material nonpublic
> information, [intentionally or recklessly] used the information by trading or by
> tipping for his own benefit.

Id. at 289; *see also* id. at 288 ("tippee liability can be established if ... the tippee intentionally or
recklessly traded while in knowing possession of" the confidential information).

In this case, the undisputed evidence establishes each of these elements as they pertain to
Weishaus and, consequently, summary judgment should be granted in favor of the Commission
and against Weishaus.

### 1.  Martin Breached a Duty of Trust and Confidence owed to Dallas When He Tipped the Inside Information to Conradt.

The breached duty in this case is the duty of trust or confidence owed by Martin to
Dallas, based on the existence of a relationship described by Rule 10b5-2(b)(2) of the Exchange
Act:

> Whenever the person communicating the material nonpublic information and
> the person to whom it is communicated have a history, pattern, or practice of

> sharing confidences, such that the recipient of the information knows or
> reasonably should know that the person communicating the material nonpublic
> information expects that the recipient will maintain its confidentiality.

17 C.F.R. § 240.10b5-2(b)(2). *See also*, <u>SEC v . Conradt</u>, 12-Civ. 8676, 2013 U.S. Dist. LEXIS

78381 (S.D.N.Y. June 4, 2013) (The SEC relies on 10b5-2(b)(2) for its actionable duty). In the

context of the case against Weishaus, the Commission has alleged that Dallas and Martin had a

history, pattern, or practice of sharing confidences such that Martin knew or reasonably should

have known that Dallas expected him to maintain the confidentiality of the Inside Information.

Martin breached his duty to maintain that confidence when he misappropriated the Inside

Information, and tipped some of the Inside Information to Conradt, who tipped Weishaus. Both

of the tippees inherited Martin's duty.

      Both Martin and Dallas admit to the existence of their relationship and the duty of trust or

confidence. They admit to several examples of exchanging confidences prior to the Disclosure.

Dallas further states that, at the time of the of the Disclosure, based on their history of

exchanging confidences as well as Martin's relative knowledge and sophistication, he expected

Martin to maintain the confidentiality of the Inside Information. Martin confirms that, at that

time, he knew Dallas expected him to hold the Inside Information in confidence and that, when

he disclosed the information to Conradt, he knew that he was violating a duty of trust and

confidence that he owed to Dallas to maintain the confidence of that information. These

admissions establish the requisite breach of duty by Martin when tipping Conradt.

### 2.    **Conradt Inherited Martin's Duty and Tipped Weishaus.**

      Conradt admits that, based on the information tipped to him by Martin and, in particular,

the fact that Martin told him that the information was confidential and that he should not tell

anyone, he knew the information disclosed to him by Martin was not publicly available, and that

16

Martin should not have shared it with him.  Indeed, given his law degree and his securities

industry sophistication as a licensed registered representative, receipt of nonpublic information

about a likely corporate acquisition no doubt raised for him a multitude of red flags.  In sum,

Conradt "knew or had reason to know that the confidential information was initially obtained and

transmitted improperly (and thus through deception)."  *See* Obus, 693 F.3d at 287; Conradt,

2013 U.S. Dist. LEXIS 78381 at \*17.  He thus inherited Martin's duty to abstain or disclose.

Obus, 693 F.3d at 288.  As he has admitted, he then deliberately tipped the name of the

prospective target and the fact of the possible acquisition, and later the identity of the acquirer

and timing information, to Weishaus as repayment for helping him and being a good friend.

### 3.   Weishaus Knew or Had Reason to Know That The Information Tipped to Him by Conradt Was Obtained Through the Tipper's Breach of Duty.

As explained by the Second Circuit in Obus, in order to be liable for insider trading, a

tippee must "have some level of knowledge that by trading on the information, the tippee is a

participant in the tipper's breach of fiduciary duty."  Obus, 693 F.3d at 287; *see also* Conradt,

2013 U.S. Dist. LEXIS 78381, at \*17.  This requirement is met in a Commission civil

enforcement case "if a tippee knew or had reason to know that confidential information was

initially obtained and transmitted improperly (and thus through deception)."  Conradt, 2013 U.S.

Dist. LEXIS 78381, at \*17, *quoting* Obus, 693 F.3d at 288; *see also* Whitman, 904 F. Supp. 2d at

370 (in a misappropriation case, the tippees' knowledge that the disclosure of the inside

information was unauthorized is sufficient for liability).  The Commission need not show that

Weishaus "knew for certain how the initial breach of fiduciary duty occurred."  Conradt, 2013

U.S. Dist. LEXIS 78381, at \*18, *quoting* SEC v. Thrasher, 152 F. Supp. 2d 291, 304 (S.D.N.Y.

2001).  Rather, the Commission need only show that "the tipper's conduct raised red flags that

confidential information was being transmitted improperly."  Conradt, 2013 U.S. Dist. LEXIS

78381, at *18, *quoting* Obus, 693 F.3d at 288.

Here the unrefuted evidence of Weishaus's law degree, employment in the securities industry, and industry training including his Series 7 and 63 licenses and his signature on the Broker's "Insider Trading Certification," shows Weishaus to be a "highly sophisticated tippee with knowledge of the securities markets and the prohibition against insider trading." *See* Conradt, 2013 U.S. Dist. LEXIS 78381, at *18. Moreover, the instant messages between Weishaus and Conradt demonstrate that Weishaus knew that he was receiving, and trading on, unlawfully obtained information. As this Court observed:

> Conradt not only told Weishaus that Conradt's information came from Martin but also that Martin had warned Conradt "not to tell anyone." Likewise, the chat logs show Weishaus and Conradt openly discussing the possibility that their use of Martin's information could result in criminal insider trading charges."

Conradt, 2013 U.S. Dist. LEXIS 78381, at *18. When aggregated with Weishaus's clandestine meeting with co-conspirators at the Morgans Hotel on the day of the Announcement, the conclusion that he knew or had reason to know that confidential information was initially obtained and transmitted improperly is inevitable. Conradt, 2013 U.S. Dist. LEXIS 78381, at *17; Obus, 693 F.3d at 288.

### 4.    The Information Tipped by Conradt to Weishaus Was Material and Nonpublic.

Information becomes public when disclosed "to achieve a broad dissemination to the investing public generally and without favoring any special person or group," or when the news is fully impounded in the price of a particular stock. SEC v. Mayhew, 121 F.3d 44, 50 (2d Cir. 1997), *quoting* Dirks, 463 U.S. at 653 n.12. The information also must be "more specific and more private than a general rumor." Mayhew, 121 F.3d. at 50, *citing* U.S. v. Cusimano, 97 F.3d 663, 666 (2d Cir. 1996), *cert. denied*, 138 L. Ed. 2d 1013 (1997). In this case, all of the Inside

Information was nonpublic at the time of the Disclosure and was not broadly disseminated to the investing public until the Announcement. The novelty of the information, and the fact that it had not been impounded into the price of SPSS stock prior to the Announcement is perhaps most evident by the market reaction on July 28, 2008 -- a 40.9% increase in the price of SPSS stock from the previous day's closing price. *See* Mayhew, 121 F.3d at 51. Moreover, all of the Inside Information originated from a person working on the SPSS Acquisition and, thus, was more specific and more private than a general rumor.

The information tipped to Weishaus also was material. Information is material "if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest]." Mayhew, 121 F.3d at 51, *quoting* Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988). As observed by the Second Circuit in Obus, "[u]nannounced acquisitions are a prototypical example of material nonpublic information." Obus, 693 F.3d at 290, n. 3. Moreover, such information takes on added significance when it originates from a person known to have inside information. Mayhew, 121 F.3d at 52.

The information tipped by Conradt to Weishaus before the June trades -- the fact of the possible acquisition, the identity of the target, and the nonpublic nature of the information, pertained, at the time tipped, to an unannounced acquisition that had proceeded to the stage at which a non-binding offer had been made, confidentiality agreements had been signed, and due diligence was beginning. It was communicated to Martin by Dallas -- an attorney working on the transaction -- and thus by an individual with specific knowledge. It was further passed to Conradt by Martin, who worked in the securities industry and who cautioned Conradt that the information was nonpublic and not to be disclosed; and to Weishaus, by Conradt, who indicated that the information came from his roommate, Martin, and that Martin was going to trade on it.

Each of Martin, Conradt, and Weishaus traded upon receipt of the information, thereby demonstrating the importance that they attached to the information and, indeed, Martin has admitted that upon learning the information from Dallas, he knew that its disclosure to the public would affect the price of SPSS stock. *See* Mayhew, 121 F.3d at 52 ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it). Moreover, as indicated above, upon the Announcement, the price of SPSS stock increased by over 40%, demonstrating the importance of the news to investors. Weishaus and Conradt placed additional trades in July armed with knowledge of the acquirer and timing, again evidencing the importance they attached to the information being provided.

> ### 5. Weishaus Knew that the Information Tipped to Him by Conradt was Material and Nonpublic and Intentionally or Recklessly Traded on the Basis of that Information for His Own Benefit.

"Like a tipper, a liable tippee must know that the information is material and nonpublic." Obus, 693 F.3d at 287. The Second Circuit further explained this requirement in its discussion of the scienter of tippers, observing that the tipper "must know that the information that is the subject of the tip is nonpublic and is material for securities trading purposes, or act with reckless disregard of the nature of the information." Id. at 286.

Weishaus's education, employment, and training demonstrate that he was a "highly sophisticated tippee with knowledge of the securities markets and the prohibition against insider trading." *See* Conradt, 2013 U.S. Dist. LEXIS 78381, at *18. This sophistication, in and of itself, supports the view that Weishaus would have appreciated the confidential and material nature of the Inside Information. Moreover, Weishaus's conduct upon receipt of the information -- his immediate purchases of SPSS securities for the first time in his brokerage account, and his purchases of more "out of the money" option contracts than he had placed before, evidence his

understanding of the significance of that information and his intent to make a profit. *See* Mayhew, 121 F.3d at 52.

Weishaus's knowledge of the confidential nature and the significance of the Inside Information, and his deliberation in trading in SPSS securities, are further evidenced by his instant messages with Conradt beginning on July 1, 2009 -- days after his first trades. As discussed above, these exchanges reflect Weishaus's recognition that failure to keep the information "in the family" could result in his going to jail, referencing Martha Stewart and the "Maverick's owner". His comment about "need[ing] this thing to pop next week or im out," further evidences his knowledge that the information was nonpublic. His thought process behind his trading on the information is demonstrated throughout the exchanges, most forcefully in his contemplation of "go[ing] for broke" in his investing in SPSS securities. Weishaus's and Conradt's collective references to getting "rich," buying a Lexus, and "this is going to be sweet" demonstrate their appreciation of the impact of this information on SPSS stock price and their anticipation of benefit.

Finally, although perhaps superfluous in view of the foregoing, his consciousness of guilt is further evidenced by his meeting with co-conspirators in a room at the Morgans Hotel on the day of the Announcement for the purpose of discussing how to react to an investigation into their trading. *See* SEC v. Warde, 151 F.3d 42, 49 (2d Cir. 1998) (deceptive behavior, such as concealing trades, supports the inference of illegal trading); *cf.* Obus, 693 F.3d at 293 (finding defendant's conduct after the tip, including his offer to employ the tipper if the tipper was fired, were relevant to whether he knew or should have known that the information was obtained in breach of a duty); U.S. v. Larrabee, 240 F.3d 18, 23 (1st Cir. 2001) (defendants' efforts to conceal their relationship and securities purchases support an inference of trading on illegal

insider information).

**B.** **This Court Should Permanently Enjoin Weishaus from Future Violations, and Order Him to Pay Disgorgement, Prejudgment Interest, and the Maximum Civil Penalty.**

      **1.** **Weishaus Should be Permanently Enjoined from Future Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder.**

Upon a finding that a violation of the federal securities laws has occurred, a Court may impose permanent injunctive relief if it finds that there is a substantial likelihood of future violations. SEC v. Gupta, No. 11 Civ. 7566, 2013 U.S. Dist. LEXIS 102274, at *7 (S.D.N.Y. July 17, 2013).

In considering whether there is a reasonable likelihood that a defendant will commit future violations, courts in the Second Circuit weigh various factors, including: (1) the fact of defendant's liability for past illegal conduct; (2) the degree of scienter involved; (3) the isolated or repeated nature of the violations; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether, because of his professional occupation, the defendant will be in a position where future violations could be anticipated. Gupta, 2013 U.S. Dist. LEXIS 102274, at *7-8, *citing* SEC v. Cavanaugh, 155 F.3d 129, 135 (2d Cir. 1998).

Weishaus's degree of scienter was high – the instant messages show deliberation in the conduct and a complete disregard of, and an intent to evade, the law. Moreover, he placed multiple trades over the course of four weeks. *See* SEC v. Contorinis, No. 09 Civ. 1043, 2012 U.S. Dist. LEXIS 19961, at *12 (S.D.N.Y. Feb. 3, 2012) (although only trading in one company, multiple trades over a series of weeks weighs in favor of injunctive relief). In addition, although Weishaus currently is unemployed, he continues to hold two securities licenses, his most recent

employment was in the industry, and he started his own hedge fund after leaving the Broker[12] --

all facts weighing in favor of the likelihood that he will again be in a position where he can

violate the law.[13]   Under these circumstances, the requested injunctive relief is appropriate.

**2.      Weishaus Should be Ordered to Disgorge his Ill-gotten Profits from His Illegal Trading, Plus Prejudgment Interest.**

Disgorgement is an equitable remedy, and it is well-established that a court has "broad

discretion not only in determining whether or not to order disgorgement but also in calculating

the amount to be disgorged." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474-75 (2d Cir.

1996), *cert. denied* 522 U.S. 812 (1997); *see also* SEC v. Haligiannis, 470 F. Supp. 2d 373, 384

(S.D.N.Y. 2007). The Commission may quantify the amount of the defendant's disgorgement

liability by producing "a reasonable approximation of profits causally connected to the

violation." Warde, 151 F.3d at 50, SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995).  The burden

falls on the defendant to dispel any uncertainty as to the proper calculation, and in determining

the amount of disgorgement, and all doubts should be resolved against the defrauding party. *See*

Warde, 151 F.3d at 50; Haligiannis, 470 F. Supp. 2d at 384-85.  In this case, Weishaus's illegal

trading in SPSS securities resulted in illegal gains of $127,485.[14]

Weishaus should also be held liable for prejudgment interest, which a district court may

in its discretion order. Haligiannis, 470 F. Supp. 2d at 385.  An award of prejudgment interest

---

[12]      Statement at ¶ 57.

[13]      While Weishaus has not acknowledged the wrongfulness of his actions and continues to contest those allegations, the Commission recognizes that this Court has previously declined to attach any significance, either way, to this factor. *See* Gupta, 2103 U.S. Dist. LEXIS 102274, at *9.

[14]      *See* Statement at ¶ 61. *See also* Patel, 61 F.3d at 140, *citing* SEC v. MacDonald, 699 F.2d 47, 55 (1st Cir. 1983).

prevents a defendant from retaining the benefit of, essentially, an interest free loan of the ill-gotten gains. Id., *citing* SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). To calculate prejudgment interest, courts have approved the use of the interest rate imposed by the Internal Revenue Service for underpayment. Haligiannis, 470 F. Supp. 2d at 385; *see also* First Jersey, 101 F.3d at 1476. Based on this rate, the Commission calculates the appropriate amount of prejudgment interest to be $19,313.26. Statement at ¶ 57.

### 3. Weishaus Should Be Directed to Pay a Civil Penalty Equal to Three Times his Illegal Profits, or $382,455.

Section 21A of the Exchange Act authorizes district courts to assess civil penalties against persons who commit insider trading. 15 U.S.C. §78u-1. The statute states that the amount of the penalty may be up to "three times the profit gained..." and shall be determined by the Court "in light of the facts and circumstances." 15 U.S.C. §78u-1(a)(2). Its purpose is both punishment and deterrence. Gupta, 2013 U.S. Dist. LEXIS 102274, at *3, *citing* Haligiannis, 470 F. Supp. 2d at 386 (imposing a penalty under Section 20(d) of the Securities Act of 1933 and Section 209 of the Investment Advisers Act of 1940). Courts look to a number of factors to determine whether a fine should be imposed, including "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." Gupta, 2013 U.S. Dist. LEXIS 102274, at *3-4, Haligiannis, 470 F. Supp. 2d at 386; *see also* SEC v. Rajaratnam, 822 F.Supp.2d 432, 433 (S.D.N.Y. 2011).

In this case, the Commission respectfully requests that the Court impose on Weishaus the maximum three times penalty available under the law, $382,455. His conduct was egregious in

24

the sense that it showed a complete disregard of the law – he, in fact, discussed the possibility of criminal prosecution while continuing his conduct, and did what he could to avoid the consequences of his actions. These same facts support a finding of a high degree of scienter. His conduct continued over the course of weeks, and there has been no showing made of his inability to pay this amount.[15] The Commission notes that Weishaus has not, and may not, be criminally convicted of his actions and that, accordingly, the imposition of this treble penalty is necessary to effectuate Congress's purpose of making insider trading a "money losing proposition," for Weishaus and for any others who would consider it. See Gupta, 2013 U.S. Dist. LEXIS 102274, at *5, Rajaratnam, 822 F. Supp. 2d at 434.

### V.   CONCLUSION

For the reasons set forth above, the Plaintiff's motion for summary judgment should be granted.

Dated:  September 17, 2013                    Respectfully Submitted,

                                                   SECURITIES AND EXCHANGE COMMISSION

                                                   s/ Catherine E. Pappas
                                                   Catherine E. Pappas
                                                   G. Jeffrey Boujoukos
                                                   A. Kristina Littman
                                                   Mellon Independence Center
                                                   701 Market Street, Suite 2000
                                                   Philadelphia, PA 19106
                                                   (215) 597-3100

---

[15]   The Commission notes that the requirement of risk of substantial loss derives from the penalty provisions of Section 20(d) of the Securities Act, and is not part of the statutory requirement of Section 21A. Weishaus's trading both risked, and caused losses to, at least, the parties on the other end of his trades. Moreover, insider trading damages investor confidence in the fairness and integrity of the markets and causes a resulting loss of investor participation in those markets. *See* O'Hagan, 521 U.S. at 658.

## CERTIFICATE OF SERVICE

This is to certify that I have this 17th day of September, 2013, caused a true and correct copy of the foregoing document to be served in accordance with ECF Filing Rules, Section 9, and Local Rule 5.2 on the following counsel:

Catherine L. Redlich, Esquire
Driscoll & Redlich
521 Fifth Avenue, Suite 3300
New York, NY 10175
credlich@driscollredlich.com
(Counsel for Thomas Conradt)

Michael J. Grudberg, Esquire
Ballard Spahr Stillman & Friedman LLP
425 Park Avenue, 26th Floor
New York, NY 10022
grudbergm@bssfny.com
(Counsel for David J. Weishaus)

Larry H. Krantz, Esquire
Krantz & Berman LLP
747 Third Avenue, 32nd Fl.
New York, NY 10017
lkrantz@krantzberman.com
(Counsel for Trent Martin)

s/ Catherine E. Pappas
Catherine E. Pappas